**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

RICHARD LEROY PARKER,

        Defendant.

No. 17-CR-1034-LRR

**REPORT AND RECOMMENDATION**

_____

## TABLE OF CONTENTS

I.  Factual Background ............................................................................... 2

  A.  Summary ...................................................................................... 2

  B.  Questioning At the Apartment ............................................................ 3

  C.  Questioning at the Police Department .................................................. 6

  D.  Defendant's Arrest at the Hospital ...................................................... 7

  E.  Search of Defendant's Residence ........................................................ 8

II.  Discussion......................................................................................... 9

  A.  Defendant's Incriminating Statements.................................................. 9

  B.  The Search Warrant ..................................................................... 18

III.  Conclusion ...................................................................................... 22

This matter is before the Court on defendant's Motion to Suppress Evidence. (Doc. 36). The government timely filed its resistance on November 20, 2017 (Doc. 43), and the Court held a hearing on the motion on November 29, 2017. At the hearing the government called Dubuque Police Officers Brendan Welsh, Matt Walker, Bruce Deutsch, and Dave Randall to testify. The Court also admitted without objection government exhibits 1 through 9.

For the following reasons, I respectfully recommend the Court **grant in part and deny in part** defendant's motion.

## I. FACTUAL BACKGROUND

### A. Summary

Shortly after midnight on April 17, 2017, Dubuque Police officers and paramedics responded to a 9-1-1 call placed by defendant reporting that a woman was not breathing. Defendant and the victim had spent the prior day and evening with Donte Richards and Ashley Ostrander in the apartment Richards and Ostrander shared on Rhomberg Avenue in Dubuque. Attempts to resuscitate the victim at the scene were unsuccessful and she was later pronounced dead at the hospital. During the first fifteen to twenty minutes at the scene, officers questioned the occupants about everyone's activities the prior day, including whether they and the victim consumed alcohol and/or controlled substances. During this interaction, defendant made incriminating statements about his and others' drug usage. After that, the officers and occupants remained in the apartment until about 2:45 AM. At that point the officers asked Richards, Ostrander and defendant to accompany them to the police department for further questioning. Richards and Ostrander declined and were ultimately taken to another residence. Defendant agreed and officers transported him to the police department. At the police department defendant waived his constitutional rights and made further incriminating statements. A short time after the interview, defendant stated he was not feeling well and paramedics took him to

2

the hospital.  Officers arrested defendant at the hospital for a parole violation.  Officers also obtained a search warrant to search defendant and his residence.

Defendant alleges that his initial questioning at the apartment violated his Fourth and Fifth Amendment rights, and thereby tainted the subsequent questioning at the police department.  Defendant also alleges that probable cause did not support the search of his residence.  Therefore, these events require more detailed facts.

### B.    Questioning At the Apartment

Officer Matthew Walker conducted the questioning of defendant at the apartment.[1] When Officer Walker first made contact with defendant, defendant was in the living room where Richards, Ostrander and another officer were present.  An officer asked Richards about a statement the officer believed defendant made to another officer to the effect that defendant had choked the victim.  Richards vehemently denied it, although in the video of the encounter the officer's notes about the comment are visible.

Officer Walker stepped into the living room and asked defendant's name. Defendant then left the living room, passed through the dining room, and stepped into the kitchen while Officer Walker remained in the living room.  A minute or so later defendant walked back into the dining room and approached the living room, paused, and then turned to walk away again.  Officer Walker stated something to the effect of "Hey, Richard, do you have a moment."  Defendant turned around and Officer Walker then asked questions about defendant's date of birth and residence.  Defendant answered

---

[1] The layout of the apartment helps to understand the movement of defendant.  Because the layout is clearly visible on the officers' body camera videos (Exhibits 1 through 6), a summary description will suffice here.  The apartment is on the first level of a house.  At the front of the apartment is a living room, followed by a small dining room, followed by the kitchen.  Off the kitchen is a bedroom, where the victim was located, and a vestibule that leads to the back door. During Officer Walker's questioning, defendant moved from the living room to the kitchen, to outside the back door, to back into the vestibule.  After questioning he sat in the dining room. Richards and Ostrander generally remained in the living room for all relevant time periods.

Officer Walker, then turned away from him and walked into the kitchen where he got a drink of water from the kitchen faucet. Officer Walker followed defendant into the kitchen and asked more questions about defendant's apartment and telephone numbers. Defendant indicated he lived nearby. After getting a drink from the kitchen faucet, defendant walked past Officer Walker and into the dining room again. Officer Walker followed defendant into the dining room. Defendant indicated he had been with the victim in the bedroom and was the last to see her breathing. Officer Walker asked defendant if the victim had been drinking or taking drugs. Defendant said she had been drinking and took some cocaine about two hours before. When defendant started to move toward the kitchen again, Officer Walker said something to the effect of "I need to talk to you; kinda just stay here."

After Officer Walker conveyed the information about the victim's drug use to the paramedic, Officer Walker and defendant again spoke briefly in the dining room about the victim's drug use. On the video one can hear loud, emotional laments from Ostrander who was in the living room adjoining the dining room. One can also see other officers and paramedics occasionally walking through the dining room and between Officer Walker and defendant. Officer Walker asked defendant to go outside so they could talk without the distractions. As Officer Walker and defendant walked through the kitchen to leave the apartment they had a discussion about getting defendant a shirt as he had none on. It appeared to me on the video that defendant was sweating while Officer Walker was talking to him. The temperature outside was about 50 degrees Fahrenheit. Defendant's shirt was in the bedroom where emergency personnel were attempting to save the victim's life, however, so they were unable to retrieve defendant's shirt.

Once outside, Officer Walker continued to ask defendant questions. At first, Officer Walker asked questions to determine if defendant had assaulted the victim in any way, which defendant denied. Officer Walker then asked defendant questions about his

own drug use that day and more questions about the victim's drug use and her medical health generally, such as whether she showed signs of having difficulty breathing earlier in the night. On three occasions during this conversation defendant moved toward the house and Officer Walker asked him to stay back, including one time when it was apparent that the paramedics were entering the house with a gurney and would be leaving soon with the victim's body. Defendant complained about being cold. Officer Walker entered the apartment again to inquire about trying to get defendant's shirt. Defendant followed and moved into the vestibule on his own.

Officer Walker then stayed with defendant in the vestibule for a few minutes, continuing to ask defendant questions about the details of the evening, including whether the group went anywhere. Defendant stated that they went to a nearby store to buy beer and soda. After a few minutes, however, another officer suggested Officer Walker and defendant move because the paramedics were about to remove the victim and would have to move through the vestibule. One of the officers also suggested that defendant would be warmer in the dining room anyway. Defendant moved into the dining room. Officers gave defendant a sweatshirt, which defendant wrapped around his shoulders. Officers also retrieved an ottoman from the living room for defendant to sit on. Defendant sat on the ottoman and leaned his back against the wall. Defendant remained seated in that general posture until investigators arrived at the apartment around 2:45 AM, at one point appearing to sleep. During this time period, Officer Walker generally stayed in the dining room standing opposite defendant and, on occasion, another officer would be in the room for short periods. Although officers asked defendant a couple questions during this time period, they did not ask about defendant's criminal activity or involvement with drugs and defendant did not make any incriminating statements.

In total, Officer Walker spoke with defendant for approximately twenty minutes. Neither during this time period, nor afterwards while defendant sat in the dining room

did any officer tell the defendant he was under arrest, but they also did not tell him he was free to leave. On the other hand, defendant never asked to leave, nor did he attempt to leave the apartment.

The approximate times of these events were:

| | |
|---|---|
| 12:24 AM | Officers first arrived at the residence |
| 12:28AM | Officer Matthew Walker began talking to defendant in the kitchen |
| 12:31 AM | Defendant complied with Officer Walker's request to move their conversation outside where there were fewer distractions |
| 12:46 AM | Defendant and Officer Walker continued discussion in vestibule |
| 12:48 AM | Defendant began sitting in dining room and remains there |
| 1:02 AM | Paramedics took victim to the hospital |
| 1:30 AM | Officers learn of victim's death |
| 2:45 AM | Investigator Randall Arrived at the Apartment |

### C.     Questioning at the Police Department

At approximately 2:45 AM, Investigator Dave Randall arrived at the apartment. He was dressed in civilian clothes and, although armed, his firearm was not visible. He encountered defendant in the dining room. Another officer was present in the room.

At approximately 2:48 AM, Investigator Randall asked defendant if defendant would come down to the police department to answer questions. Defendant asked why it needed to occur at the police department. Investigator Randall replied that the police department was a better environment with fewer distractions. Defendant agreed to go to the police department. Investigator Randall told defendant he was not under arrest.

Another officer took defendant to the police department, having also provided defendant with a blanket with which to cover himself. At the police department, officers

placed defendant in an interview room, which was equipped with a video camera that captured the subsequent events. Officers provided defendant with a soda. Investigator Randall entered the room a short time later, at approximately 3:22 AM, and began the interview. Defendant asked if the victim was okay. Investigator Randal said something to the effect that the victim was taken to the hospital and they have officers at the hospital. Investigator Randall knew at that time that the victim was dead.

Before asking defendant any questions, Investigator Randall told defendant that he was not under arrest. Investigator Randall told defendant, however, that because he did not know exactly what happened, he was going to advise defendant of his constitutional rights. Investigator Randall then advised defendant of his constitutional rights and defendant waived those rights. Exhibit 8. Defendant then made incriminating statements.

After Investigator Randall completed the interview, he left the room. Officer Walker arrived at the police department at approximately 4:15 AM and was outside the interview room. At approximately 5:00 AM, defendant knocked on the door to the interview room. Officer Walker opened the door and defendant stated that defendant was having chest pains and wanted medical attention. Paramedics were called and took defendant to the hospital. Investigator Randall rode with defendant to the hospital. While there, defendant made more incriminating statements, such as saying he was sorry and that he had obtained a substance from his truck. The conversation was initiated by defendant, although Investigator Randall may have asked some follow-up questions.

### D. *Defendant's Arrest at the Hospital*

Officer Walker joined defendant and Investigator Randall at the hospital. Investigator Randall left, but Officer Walker remained. Defendant requested that Officer Walker contact defendant's probation officer. Officer Walker was eventually able to reach the probation officer by phone at approximately 7:00 AM and overheard part of the conversation defendant had with his probation officer. After a brief conversation,

defendant and his probation officer spoke a second time.  As a result of those conversations, or as a result of information other officers may have provided the probation officer, the probation officer decided to have defendant arrested for a parole violation.  Defendant was arrested before he left the hospital.

### E.     *Search of Defendant's Residence*

Officer Brenden Welsh was tasked with the responsibility of drafting search warrants in connection with the investigation.  He gathered information from other officers and drafted the application and affidavit in support of a search warrant of defendant and "[t]he residence of 511 Garfield #206, Dubuque, Iowa."  The caption of the Application for Search Warrant reads "State of Iowa v. Richard Leroy Parker [date of birth], 511 Garfield #206, Dubuque, Iowa 52001."  Exhibit 9.  The affidavit attached to the application contains no reference to the address.  There is nothing in the affidavit itself that provides facts to establish that defendant lived at 511 Garfield.  For that matter, there is nothing in the affidavit stating who lived at the address.  There is no indication in the affidavit of when defendant had last been present at 511 Garfield.  Nor is there any reference to drug activity at the residence.

At the hearing on defendant's motion, Officer Welsh testified that he uses a template for applying for search warrants and that it is the common practice for officers to list the name of the suspect and his address in the caption of an application for a search warrant.  Officer Welsh further testified that the state court judges generally understand that the caption therefore alleges that the defendant lives at the listed address.  At approximately 5:00 AM, Officer Welsh submitted the application to a state court judge, who found probable cause and issued the search warrant.  Officers thereafter searched defendant's residence where they seized some incriminating evidence.

## II.    DISCUSSION

Defendant seeks to suppress both his incriminating statements and the evidence from the search of his residence.  The first issue implicates defendant's rights under both the Fourth and Fifth Amendments to the United States Constitution.  The second issue implicates defendant's Fourth Amendment rights.  I will address each issue in turn.

### A.    Defendant's Incriminating Statements

The Fourth Amendment to the United States Constitution protects individuals from "unreasonable searches and seizures" by the government.  U.S. CONST. amend. IV. Officers may briefly detain persons if they are aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Givens*, 763 F.3d 987, 989 (8th Cir. 2014) (citation and internal quotation marks omitted).  The Fourth Amendment is not violated when a police officer who has reasonable suspicion that criminal activity is afoot briefly detains a suspect while making a reasonable investigation to confirm or dispel the officer's suspicion.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)).  A *Terry* stop normally includes brief questioning "reasonably related in scope to the justification" for the stop. *United States v. Brignoni–Ponce*, 422 U.S. 873, 881 (1975).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that an officer must advise a suspect of his constitutional rights after the person has been taken into custody.  *Miranda* warnings are not generally required during *Terry* stops. *Berkemer v. McCarty*, 468 U.S.

420, 441 (1984). *Miranda* warnings are required, however, before the police engage in "custodial interrogation," which the Supreme Court defined in *Miranda* as whenever "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

A *Terry* stop may evolve into a custodial arrest where circumstances would lead a reasonable person to believe he or she has been deprived of freedom of action. "A de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Hill*, 91 F.3d 1064, 1070 (8th Cir. 1996) (citation and internal quotation marks omitted). In determining whether a person is in custody for purpose of requiring a *Miranda* warning, courts consider a number of factors, including (1) the duration of the encounter; (2) whether the suspect was handcuffed; (3) whether the suspect was transported or isolated; (4) whether officers advised the suspect that he was free to go or the suspect requested permission to leave; (5) whether officers told the suspect he was under arrest; (6) whether the suspect initiated contact with authorities; (7) whether officers used strong arm tactics or deceptive stratagems; (8) whether the atmosphere was police dominated; and (9) whether officers placed the suspect under arrest at the termination of questioning. *Id.*; *United States Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). This is not an exhaustive list; rather, a court considers the totality of the circumstances. *See United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004) (stating that the *Griffin* factors are not means exhaustive and should not be applied "ritualistically"). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

Considering the totality of the circumstances, I find that defendant was not in custody while at the apartment. I find that the encounter Officer Walker had with

defendant constituted a reasonable *Terry* stop; that Officer Walker had reasonable, articulable suspicion to investigate what happened to the victim, drug activity at the apartment, and whether the drug activity had something to do with the victim's condition. Defendant conceded at argument that officers did not violate defendant's constitutional rights by asking him questions about the victim's drug use, but at some point crossed the line when they asked him about his own drug use and activities that night. The victim's drug use cannot be so easily divorced from defendant's drug use and activities. Once defendant mentioned the victim used cocaine, Officer Walker had a reasonable articulable suspicion to believe that criminal activity was afoot, not only with regard to what caused the victim to stop breathing, but also with respect to illegal drug use and possession by her and others. Officer Walker's questioning of defendant on these topics was brief— only 20 minutes—and was limited to the victim's condition and drug use. Thus, I find that defendant was not in custody during this time.

Nor do I find that the *Terry* stop evolved into a custodial arrest. Defendant initiated contact with law enforcement officers. At the hearing, defendant argued that, although he called 9-1-1, he was reporting a medical emergency and was not soliciting contact with law enforcement officers. This belies common sense. A reasonable person calling 9-1-1 for any purpose would believe that law enforcement officers would respond to the scene. Defendant could have left before officers arrived; he chose to remain.

Once officers arrived, defendant generally moved where he desired, especially during the early interaction with Officer Walker. Although defendant did not attempt to leave the apartment, defendant had the opportunity to do so. Defendant freely moved from room to room, walking past officers without restriction. Officer Walker then requested defendant to stay in the dining room so they could talk, and later requested defendant accompany Officer Walker outside, again so they could talk without interruption. Defendant never protested or refused; rather, he acquiesced to Officer

Walker's requests. Once outside, Officer Walker requested defendant stay there a few times to talk and to stay out of the way of emergency personnel. When defendant complained about the cold and Officer Walker entered the apartment to see about getting defendant a shirt, he left defendant standing outside alone. There was nothing keeping defendant from leaving; he lived nearby. Instead, defendant re-entered the apartment, stepping into the back vestibule, on his own volition. Officer Walker then spoke with him a few minutes longer in the vestibule before they both moved to the dining room. At that point, all relevant questioning ceased.

At no point during this encounter did defendant request permission to leave, albeit no officer told him he was free to leave either.[2] Nor did defendant attempt to leave the apartment. No officer told defendant that he was under arrest. Neither defendant, nor anyone else in the apartment, was placed in handcuffs.

Officer Walker did not use any strong arm or coercive tactics. Officer Walker never touched defendant. Nor did Officer Walker use deceptive stratagems. Officer Walker did not allege to have information he did not have, nor fail to disclose pertinent information he did have. Officers did question Richards about whether defendant choked the victim. This was not part of a deceptive stratagem. I find that officers had reasonable grounds to believe that Donte Richards initially said something about defendant choking the victim. This is borne out by the notes that are visible during the interchange with Richards in the living room when he denied making such a claim. Whether the officer misunderstood Richards, or Richards made the statement but later retracted it, there is

---

[2] Although at one point an officer can be heard telling the other occupants that "we can't let anyone wander around in the house [right now]" due to the investigation and resuscitation attempts (Exhibit 5), this statement is insufficient to create a custodial statement at the relevant time. This statement was not made until after defendant made the incriminating statements and, thus, could not have led defendant to believe he was in custody at the time he made the statements.

no indication that officers fabricated the allegation in an effort to mislead defendant. Moreover, I find that the evidence did not show that Officer Walker knew the victim had died at the time he spoke with defendant. At some later time that evening and before defendant went to the police department, some officers at the apartment learned the victim had died. There is, again, no evidence that officers intentionally withheld this information from defendant in an effort to manipulate him into making incriminating statements.

Further, I do not find that the atmosphere was police-dominated. There were, of course, several police officers in the apartment. At some points, there appeared to be as many as six police officers present, along with emergency personnel. This was, after all, a life-threatening event. No officer brandished a firearm or any other weapon. Officers did not raise their voices or attempt to dominate the atmosphere verbally. A few of the officers were focused on the victim and had little or no contact with the other occupants of the home. After the victim was removed from the home, officers remained but did little more than stand around while the occupants sat and slept. Given the medical emergency that caused defendant to call for assistance, the atmosphere at the time Officer Walker spoke to defendant was dominated by the efforts to save the victim's life and find out what caused her to stop breathing. Moreover, at the time defendant made the incriminating statements at the apartment, only Officer Walker was interacting with him, and they were often alone; indeed, at one point they were outside where no other officers were present. Finally, officers did not arrest defendant at the conclusion of the questioning.

Defendant voluntarily agreed to accompany officers to the police department afterwards to answer more questions. He was explicitly advised at that time he was not under arrest. Richards and Ostrander declined going to the police department and the

officers did not arrest them. Rather, they gave them a ride to another location, explaining that they could not remain during the search.

After defendant arrived at the police department, the only incriminating statements he made occurred after he waived his constitutional rights. The government bears the burden of proving by a preponderance of the evidence that a defendant's waiver of *Miranda* rights was an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege. *United States v. Black Bear*, 422 F.3d 658 (8th Cir. 2005). *See also United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994) (holding that a *Miranda* waiver must be voluntary, knowing, and intelligent, and "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the suspect must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (citations and internal quotation marks omitted)). Whether a waiver was voluntary, knowing, and intelligent is determined by the "'totality of circumstances surrounding the interrogation.'" *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The determination of whether a waiver is voluntary for *Miranda* purposes is determined by the same standard used to determine whether a statement is voluntary for Fifth Amendment due process purposes. *United States v. Makes Room for Them*, 49 F.3d 410, 414 (8th Cir. 1995). Statements made after a knowing and voluntary waiver of *Miranda* rights are admissible unless there were earlier, unwarned statements resulting from coercion or a calculated effort to undermine the suspect's free will. *United States v. Briones*, 390 F.3d 610, 613-14 (8th Cir. 2004).

Defendant has not specifically alleged his waiver was involuntary, but I will address this issue *sua sponte* because some of the cross examination of witnesses at the hearing bore on this issue. Defendant came to the police department voluntarily. Before any questions were asked of him, defendant asked if the victim was okay. Investigator Randall knew at that time that the victim had died, but avoided answering defendant's

question. In doing so, however, Investigator Randall did not lie to the defendant or engage in deceptive tactics. Investigator Randall then told the defendant that he was not under arrest. Then Investigator Randall advised defendant of his constitutional rights and defendant agreed to waive his rights, in writing. Exhibit 5.

Under the totality of circumstances, I find defendant's waiver voluntary. Knowing the victim had died may have impacted defendant's assessment of the wisdom of waiving his rights and speaking with the police. Nevertheless, "a valid waiver does not require that an individual be informed of all information 'useful' in making his decision or all information that 'might . . . affec[t] his decision to confess.'" *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (quoting *Moran*, 475 U.S. at 422) (omission in original). The Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Spring*, 479 U.S. at 576–77 (citation and internal quotation omitted). Where additional information would "affect only the wisdom of a *Miranda* waiver, not its voluntary and knowing nature," the waiver is not invalid. *See id.*, at 577.

As noted, sometime after Investigator Randall finished questioning defendant at the police department, defendant requested medical attention and was taken to the hospital. There, he made additional incriminating statements. Defendant has not specifically alleged that those statements were obtained in violation of his constitutional rights other than derivatively as a result of allegedly violating his rights by questioning him at the apartment. Regardless, I find these statements were made by defendant after he had been advised of his constitutional rights. Further, defendant was not under arrest at the time he made these statements. He was at the hospital and, although an officer remained with him, he was not confined, handcuffed, or in any other way restrained. Finally, defendant volunteered the statements, and they were not made in response to questioning initiated by law enforcement officers.

In the event that a reviewing court finds defendant was in custody at the apartment and therefore officers violated defendant's Fifth Amendment rights, it will be necessary to consider whether defendant's Fifth Amendment rights from that point forward should also be suppressed. Therefore, I will consider this issue.

To break the causal chain between a constitutional violation and a statement given later, the statement must be "'sufficiently an act of free will to purge the primary taint.'" *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir. 1994) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)). In determining whether defendant's later statements retain the taint of an earlier violation of his constitutional rights, the Court must consider four factors: (1) the giving of *Miranda* warnings; (2) the temporal proximity of the illegal search and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011). The government has the burden of showing that defendant's later statements were sufficiently purged of the taint of the previous constitutional violation. *See Riesselman*, 646 F.3d at 1079 (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

In this case, Investigator Randall provided defendant with *Miranda* warnings before any questioning at the police department. Although *Miranda* warnings alone do not act "talismanically to purge the taint of prior illegalities," they are an important factor. *Oregon v. Elstad*, 470 U.S. 298, 336 (1985). *See also Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (stating that giving a *Miranda* warning is an important factor, albeit not by itself sufficient); *Brown v. Illinois*, 422 U.S. 590, 603 (1975) (same).

Approximately three hours passed between the initial questioning of defendant by Officer Walker and the questioning of defendant at the police department. That is not such a short time as to render defendant's later statements involuntary. *See United States v. Becker*, 333 F.3d 858, 862–63 (8th Cir. 2003) (holding that a forty-nine minute lapse

of time was not so short as to render the defendant's statements involuntary); *United States v. Ball*, No. 13-cr-2013-LRR, 2014 WL 2866131, at *6 (N.D. Iowa Jun. 24, 2014) (finding a ninety minute lapse of time was not so short as to render the defendant's statements involuntary).

Between these events, defendant remained in the apartment, and never sought to leave, while one or more police officers remained in the room with him. Also, and importantly, defendant was twice told that he was not under arrest, once at the apartment and a second time at the police department. *See United States v. Ellis*, 910 F. Supp.2d 1008, 1020 (W.D. Mich. 2012) (finding intervening circumstances, including advising defendant he was not under arrest, removed any taint from a later confession); *United States v. Lawrence*, No. CRIM. 05-333(MJD/RLE), 2006 WL 752920, at *6 (D. Minn. Mar. 23, 2006) (in concluding the defendant's statements were not tainted by an earlier constitutional violation, the court noted the intervening fact that officers told the defendant he was not under arrest).

Finally, the government's alleged misconduct was not flagrant. The Eighth Circuit Court of Appeals has found this factor as the "most important factor because it is directly tied to the purpose of the exclusionary rule-deterring police misconduct." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006). As the Eighth Circuit has noted, courts will find "purposeful and flagrant conduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.'" *Simpson*, 439 F.3d at 496 (citations omitted). In this case, there was nothing about Officer Walker's initial questioning of defendant at the apartment that suggested that Officer Walker or any other officer knew or believed the questioning was obviously unconstitutional. And, although the questioning was investigatory in nature, there are no

facts suggesting it was designed or undertaken for the purpose of evading defendant's constitutional rights.

Therefore, I respectfully recommend the Court find the questioning of defendant at the apartment did not violate his constitutional rights and that defendant waived his constitutional rights for any statements made at the police department and hospital. I further respectfully recommend that, even if the Court finds that Officer Walker's questioning of defendant at the apartment violated defendant's constitutional rights, the Court find any taint from that violation was purged such that defendant's later statements at the police department and hospital should not be suppressed. In short, I respectfully recommend the Court deny defendant's motion to suppress his statements.

## B.    *The Search Warrant*

Defendant asserts that the search of his residence was not supported by probable cause in the application and affidavit submitted in support of the search warrant. In particular, defendant argues that the affidavit fails to articulate facts that establish probable cause to believe any evidence would be found in his residence.

"Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances." *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007). If an affidavit in support of a search warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" the warrant establishes probable cause to search the place. *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The determination of whether or not probable cause exists to issue a search warrant is to be based upon a common-sense reading of the entire affidavit." *United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982) (citations and internal quotation marks omitted).

Here, defendant's name is listed in the caption of the affidavit and below it is an address. In the description of the place to be searched, the application states "[t]he person of Richard Leory Parker" and "[t]he residence of 511 Garfield #206, Dubuque, Iowa." The application does not explicitly describe that address as defendant's residence. Nothing in the attached and incorporated affidavit references the address at all. I find that this application lacks probable cause because there is no assertion of fact that defendant lived at the address, and there are no facts in the affidavit establishing that fact or even making reference to the address. *See United States v. Brack*, 188 F.3d 748, 755 (7th Cir. 1999) (refusing to accept portions of an affidavit that contained only conclusions when they lacked factual support); *United States v. Dickerson*, 975 F.2d 1245, 1249-50 (7th Cir. 1992) (concluding it was "doubtful" that probable cause to search suspect's house existed when affidavit alleged no facts that evidence of robbery could be found inside house; affidavit alleged only that robber drove away in a car with a license plate number registered to defendant at his house).

The government argues that the listing of the address below defendant's name in the caption is an assertion of fact stating that is defendant's address. At best, however, that is only an inference one may draw from the caption. The officer's testimony that it is his understanding that including such information in the caption is generally understood by the judges to be an assertion of fact is not evidence this Court can consider; whether probable cause exists must depend on what is contained within the four corners of the application.

Defendant argued that the search warrant application lacked probable cause because it did not contain any facts establishing a "nexus between the events at Rhomberg and 511 Garfield" and "is totally devoid of any showing of suspicious activity in and around 511 Garfield." (Doc. 36-1, at 8). The affidavit does, however, establish probable cause to believe defendant was involved in the distribution of controlled substances. The

government is correct that the case law would support a common sense conclusion that a drug dealer is likely to keep incriminating evidence at his or her residence. *United States v. Carpenter*, 341 F.3d 666, 671-72 (8th Cir. 2003). Therefore, my conclusion that the warrant lacks probable cause is premised on the lack of facts connecting defendant to that residence; were there facts alleged in the affidavit linking him to the residence, I would find probable cause existed for searching the residence.

The government argues in the alternative that, if the Court finds the search warrant application lacked probable cause, that the Court should still not suppress the evidence because the officers acted in a good faith reliance on a judge's authorization of the search. In *United States v. Leon*, the Supreme Court held that evidence obtained by "officers reasonably relying on a warrant issued by a detached and neutral magistrate" is admissible. *Leon*, 468 U.S. 897, 913 (1984). Under the *Leon* good faith exception to the exclusionary rule, suppression of evidence seized pursuant to an invalid warrant is required only if: (1) the affiant misled the issuing judge with a knowing or reckless false statement; (2) the issuing judge wholly abandoned her judicial role; (3) the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant was "so facially deficient" that the executing officer could not reasonably presume its validity. *Leon*, 468 U.S. at 923 (internal citations and quotation marks omitted).

When issuing a search warrant, a judge may "draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense." *See United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997). In some cases, courts have applied the *Leon* good faith exception to save search warrants where the issuing judge could have made inferences to fill in the missing facts that would link the residence to be searched with the defendant. *See*, *e.g.*, *United States v. Hunter*, 86 F.3d 679, 681-82 (7th Cir. 1996) (finding *Leon*

good faith exception applied where affidavit established that the defendant resided at the address in question because the affidavit referred to "Hunter's residence," described the address to be searched as a "residence," and made no reference to any other location connected to the defendant); *United States v. Moultrie*, Nos. 99-2199, 99-2200, 99-2866, 2000 WL 133813, at *3 (7th Cir. Feb. 2, 2000) (unpublished) (finding *Leon* good faith exception applied where defendant's address was listed only in the caption and was not referenced in the affidavit because "it was not unreasonable for the magistrate to have inferred that 1027 Emery Street was Stanley's residence, given that the affidavit concluded this and that it also listed 1027 Emery Street underneath Stanley's name at the top.).

I think in this case such an inference is a bridge too far. In both *Hunter* and *Moultrie*, there was at least an assertion that the address was the defendant's address. This is not a case, such as the government cites, involving a mere typographical error. (Doc. 43-1, at 12-13 n.7 (citing *United States v. Butler*, 594 F.3d 955, 961-62 (8th Cir. 2010)). Here, one may draw only an inference that the address listed in the caption below defendant's name was his address. Nothing in the application asserted that fact, let alone established that fact. I find the search warrant so facially deficient that I do not believe any police officer could reasonably believe it established probable cause to search the residence, regardless of whether a judge signed the warrant. *Leon*, 468 U.S. at 923. Therefore, I respectfully recommend that the Court suppress the evidence seized from defendant's residence.

## III. CONCLUSION

For the foregoing reasons, I respectfully recommend that defendant's motion be **DENIED IN PART AND GRANTED IN PART**. Specifically, I recommend the Court **deny** defendant's motion to suppress as to all statements he made, but **grant** defendant's motion to suppress evidence seized from his residence. Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 6th day of December, 2017.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa